# EXHIBIT 1

## SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF WESTCHESTER

| | |
|---|---|
| DOLORES GAY, individually and on behalf of all others similarly situated, | **SUMMONS** |
| Plaintiff, | |
| -against- | Index No. |
| | Purchased on   November 11, 2024 |
| WALMART INC., | |
| Defendant. | |

To the above-named Defendant:

**PLEASE TAKE NOTICE THAT YOU ARE HEREBY SUMMONED** to answer the Complaint of the Plaintiff and to serve a copy of your Answer on the Plaintiff at the attorney address indicated below within 20 days after service of this Summons (not counting the day of service itself), or within 30 days after service is complete if the Summons is not delivered personally to you within the State of New York.

YOU ARE HEREBY NOTIFIED THAT should you fail to answer, a judgment will be entered against you by default for the relief demanded in the Complaint.

Dated:    November 11, 2024

/s/Spencer Sheehan
Sheehan & Associates P.C.
60 Cuttermill Rd Ste 412
Great Neck NY 11021
Tel: (516) 268-7080
Fax: (516) 234-7800
spencer@spencersheehan.com

Plaintiff Gay designates Westchester County as place of trial. The basis of venue is:

☒    Plaintiff Gay's residence, 202 Spring St, South Salem, NY 10590

☐    Where a substantial part of the events or omissions giving rise to the claim occurred

☐    Other

## SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF WESTCHESTER

DOLORES GAY, individually and on behalf of all others similarly situated,

Plaintiff,

- against -

WALMART INC.,

Defendant.

Class Action Complaint

Jury Trial Demanded

Dolores Gay ("Plaintiff"), through Counsel, alleges upon information and belief, except for allegations about Plaintiff, which are based on personal knowledge:

1.    The last ten years have seen Americans consume a greater percentage of their food as "snacks," often consumed, "on-the-go," instead of formal meals.

2.    This is reportedly due to "increasingly busy lifestyles and changing family routines."

3.    Shoppers are seeking "healthy indulgences," or foods "with all the flavor and taste desired, without the guilt of eating something 'bad' for you," due to the presence of "real ingredients," understood as those which were minimally processed, natural, and/or associated with positive health benefits.

4.    Consumer research company Mintel attributed this demand for "real ingredients," in part due to media attention focused on lack of transparency in the

Case 7:25-cv-02326-CS    Document 1-1    Filed 03/20/25    Page 4 of 29

food industry.[1]

5.    The result is that shoppers want to consume foods with the types of ingredients they have in their refrigerators and pantries, instead of highly processed, synthetic substitutes, and/or lower quality byproducts.

6.    One of the key ingredients to meet these nutritional and sensory demands is cheese.

7.    Industry data confirms the increased popularity of cheese, with its relative price and per capita consumption rising over the past decade to an all-time high of 50 lbs.

8.    Multiple reasons explain the surge in popularity for cheese.

9.    First, demand for cheese is consistent with growing preferences for natural foods, made without chemicals or harsh processing.

10.    Cheese's definition, as "the coagulated, compressed, and usually ripened curd of milk separated from the whey," fits this bill.[2]

11.    Second, more than half the public consider cheese "healthy" and "nutritious," because it is high in protein and "healthy" fats, with key vitamins and minerals, like calcium.

---

[1] Lynn Dornblaser, Director, Innovation & Insight, Mintel, "Clean Label: Why this Trend is Important Now," 2017.
[2] Merriam-Webster definition.

Case 7:25-cv-02326-CS    Document 1-1    Filed 03/20/25    Page 5 of 29

12.  That this factor was important to consumers was observed by a marketing executive, noting how "Dairy, in its many forms, is increasingly seen as an inherently healthy simple food."

13.  Third, the versatility of cheese means it can be used in prepared and packaged applications, instead of only consumed in cubes, slices, or sticks.

14.  Fourth, marketers know claims like "made with real cheese" add value to the types of shelf stable, on-the-go, convenience snacks, that consumers may have written off years ago as full of artificial and highly processed ingredients.

15.  This is because cheese "has indulgent properties for consumers who want to 'treat themselves,'" in addition to its reputation as nutritious.[3]

16.  To prevent unscrupulous merchants from exploiting "extrinsic cues such as visual information,"[4] in marketing foods based on "real cheese," yet delivering

---

[3] Cara Rasch, 3 Top Trends Impacting Cheese Sales, Freedonia Group, Sept. 29, 2023.

[4] Lancelot Miltgen et al., "Communicating Sensory Attributes and Innovation through Food Product Labeling," Journal of Food Products Marketing, 22.2 (2016): 219-239; Helena Blackmore et al., "A Taste of Things to Come: The Effect of Extrinsic and Intrinsic Cues on Perceived Properties of Beer Mediated by Expectations," Food Quality and Preference, 94 (2021): 104326; Okamoto and Ippeita, "Extrinsic Information Influences Taste and Flavor Perception: A Review from Psychological and Neuroimaging Perspectives," Seminars in Cell & Developmental Biology, 24.3, Academic Press, 2013; Clement, J., Visual Influence on In-Store Buying Decisions: An Eye-Track Experiment on the Visual Influence of Packaging Design, Journal of Marketing Management, 23, 917-928 (2007); Gupta K, O. et al., Package Downsizing: Is it Ethical? 21 AI & Society 239-250 (2007).

3

Case 7:25-cv-02326-CS    Document 1-1    Filed 03/20/25    Page 6 of 29

lower quality and cheaper vegetable oils, the Federal Food, Drug and Cosmetic Act

("FFDCA") of 1938, and this State's identical Agriculture and Markets Law

("AGM"), prohibited "misbranding" and adulteration, not just for real cheese, but

across the sources of nourishment sought by American families. 21 U.S.C. § 301 *et*

*seq*;[5] AGM § 3.[6]

17.   To appeal to consumers seeking meals which can be quickly and easily

prepared, yet consist of high quality, natural, familiar ingredients, with "indulgent

properties," Walmart Inc. ("Defendant") manufactures, labels, markets, packages,

distributes, and/or sells, (1) packages of four, single-servings of microwaveable

"Macaroni & Cheese," (2) with pictures of macaroni, seemingly covered in real

cheese, (3) to which the purchaser need only "Just Add Water," (4) promoted as

"Made With Real Cheddar Cheese," (5) inside a wedge of brightly colored cheese,

with the characteristic "eyes," or holes, created from the natural bacterial cultures

present in "real cheese," (6) having " "No artificial flavors," (7) under the Great

---

[5] "Misbranded" is the statutory term for labeling that is false and/or misleading, while "adulterated" means to "render (something) poorer in quality by adding another substance, typically an inferior one."

[6] Article 17, Adulteration, Packing, and Branding of Food and Food Products, AGM § 198 *et seq.*; Official Compilation of Codes, Rules and Regulations of the State of New York ("N.Y.C.R.R."), Title 1, Department of Agriculture and Markets, Chapter VI, Food Control, Subchapter C, Food and Food Products (Article 17, AGM), including 1 N.Y.C.R.R. § 250.1 (adopting federal standards of identify for foods), 1 N.Y.C.R.R. § 259.1(a) (adopting Parts 100, 101 and 102 of Title 21).

Value brand ("Product").



18. Despite the expectation that "Real Cheddar Cheese" would be the exclusive, or predominant, non-macaroni ingredient and/or component, or at least present in a significant, absolute and/or relative amount, compared to any non-cheese ingredients, if any, the Product is "adulterated" and misleads consumers, because "[the] valuable constituent [of real cheddar cheese] has been in whole or in part omitted or abstracted." AGM § 200(7); 21 U.S.C. § 342(b)(1).

19. This is revealed through the ingredient list, in fine print, on the back of the package, as the predominant components of the "Cheese Sauce" are "Whey [and] Maltodextrin," lower cost and lower quality cheese substitutes, not "real cheddar

cheese," presumably listed third, as "Semisoft Cheese," and "Palm Oil" listed fifth.

21 C.F.R. § 101.4(a)(1).[7]



**CHEESE SEASONING:** WHEY, MALTODEXTRIN, PALM OIL, CHEDDAR CHEESE…

20. The Product is "adulterated" and misleads consumers, because "[whey,

---

[7] **INGREDIENTS:** ENRICHED MACARONI (WHEAT FLOUR, NIACIN, FERROUS SULFATE, THIAMINE MONONITRATE, RIBOFLAVIN, FOLIC ACID), CHEESE SEASONING (WHEY, MALTODEXTRIN, PALM OIL, CHEDDAR CHEESE [PASTEURIZED MILK, CHEESE CULTURE, SALT, ENZYMES], LACTOSE, MODIFIED CORN STARCH, SALT, CONTAINS 2% OR LESS OF: DRY WHOLE MILK, NATURAL FLAVORS, SODIUM CASEINATE, ANNATTO EXTRACT [COLOR], TITANIUM DIOXIDE [COLOR], PAPRIKA EXTRACT [COLOR], POTASSIUM CHLORIDE, SODIUM PHOSPHATE, CITRIC ACID, POTASSIUM PHOSPHATE, YEAST EXTRACT, LACTIC ACID), MALTODEXTRIN, MODIFIED TAPIOCA STARCH, SALT, ACETIC ACID ESTERS OF MONO- AND DIGLYCERIDES, POTASSIUM CHLORIDE, MEDIUM CHAIN TRIGLYCERIDES, MONO- AND DIGLYCERIDES, GUAR GUM.

Case 7:25-cv-02326-CS    Document 1-1    Filed 03/20/25    Page 9 of 29

maltodextrin, and palm oil] ha[ve] been substituted wholly or in part [] for [real cheddar cheese]." AGM § 200(8); 21 U.S.C. § 342(b)(2).

21.   Whey is the watery liquid which remains when curds are strained from milk to produce "real cheddar cheese."

22.   Since one pound of cheese results in nine pounds of whey, the increased consumer demand for real cheese, like cheddar cheese, has created a surplus of whey.

23.   Instead of the nutritive value, such as protein, good fats, vitamins and minerals, provided to cheddar cheese from its most important component, milkfat, whey consists mostly of sugar, in the form of lactose, and a small amount of protein.

24.   This absence of milkfat means whey also lacks the creamy and savory taste of real cheddar cheese.

25.   Though whey is mainly used for dietary supplements and fertilizer,[8] the higher cost of real cheddar cheese means this convenient byproduct is a readily available "adulterant" for companies looking to skimp on real cheddar cheese.

26.   That whey is increasingly used to increase yield and protein content of foods with smaller amounts of cheese, including cheddar cheese, at lower costs, is

---

[8] Tove Danovich, One pound of cheese makes nine pounds of whey. Where does it all go?, The Counter, Aug. 16, 2018.

7

confirmed by academic treatises and journals.[9]

27.   In fact, large ingredient supplier, Grande Custom Ingredients Group, tells manufacturers of how they can use whey to achieve "significant overall savings in dairy ingredient costs."[10]

28.   For example, it describes a "Cheese Replacement Example [by using its whey ingredient,] Grande Gusto," boasting how this "replaced nearly 40% of the American cheese with Grande Gusto in a macaroni and cheese entrée…significantly minimiz[ing] the use of costly cheese."

29.   It even bragged that "Taste testers [and presumably, consumers] never would have guessed" that the manufacturer substituted real [cheddar] cheese with lower quality whey.

30.   Maltodextrin is type of starch, typically from corn, rice, or potatoes, instead of from a dairy source.

31.   Maltodextrin has no nutritional value beyond four calories per gram, made in a laboratory.

32.   It is used primarily as an "extender," to increase yields, in "real cheese," like "real cheddar cheese," imitation cheese, and/or cheese analogs.

---

[9] Julian Price, "History of the Development and Application of Whey Protein Products," in Whey Proteins, Academic Press, pp. 51-95 (2019).

[10] Brad Nielsen, Ingredients to Overcome Price Volatility in Dairy Markets, Grande Custom Ingredients Group, Mar. 16, 2021.

Case 7:25-cv-02326-CS    Document 1-1    Filed 03/20/25    Page 11 of 29

33.   Maltodextrin can be, and is, used to replace solids in real cheese, like real cheddar cheese, when fat content is removed.

34.   Palm oil is made by extracting and/or expressing the oil from palm fruits.

35.   Then, it is highly processed, through hydrogenation and/or interesterification, in the presence of chemical catalysts,.

36.   Unlike real cheese, and real cheddar cheese, which contains protein, calcium, and vitamins A and D, palm oil has negligible nutritional value, due to the processing needed to render it palatable.

37.   Unlike real cheese, and real cheddar cheese, which contain heart-healthy fats, which help control cholesterol, palm oil contains harmful trans fats.

38.   Whereas palm oil has a waxy and/or oily flavor or aroma, real cheddar cheese is known for its sharp, savory and/or creamy taste.

39.   In contrast to real cheddar cheese, a natural food, palm oil is considered an ultra-processed food ("UPF") ingredient, frowned upon by nutrition authorities and public health bodies.

40.   Since palm oil is made through an industrial process, based upon harvesting palm fruits, the amount of palm oil available commercially is roughly four times greater than the amount of real cheese, including real cheddar cheese.

41.   Instead of the nutritive value, such as protein, good fats, vitamins and minerals, provided to real cheddar cheese from its most important component,

9

milkfat, palm oil lacks such nutrients.

42.   This absence of milkfat means palm oil also lacks the sharp, creamy, and/or savory taste, of real cheddar cheese.

43.   The Product is "adulterated" and misleads consumers, because "[whey, maltodextrin, and palm oil] ha[ve] been added thereto or mixed or packed therewith so as to increase [real cheddar cheese's] bulk or weight." AGM § 200(10); 21 U.S.C. § 342(b)(4).

44.   Whey, maltodextrin, and/or palm oil, function as bulking agents, or "fillers," by helping the Product to imitate the taste and attributes of "real cheddar cheese," through adding or modifying solids, viscosity, lubricity, volume, spread, and/or water binding.

45.   Whey, maltodextrin, and/or palm oil, function as bulking agents, or "extenders," because, when processed, they are relatively bland and inert, yet can supply some characteristics of the "real cheddar cheese" they are being used to replace, at significantly lower cost.

46.   Whey is not an ingredient used in any "real cheddar cheese," and only allowed as part of something called a "cheese food," a technical and legal name for a cheese-like substance.

47.   Palm oil is used to produce cheese analogues that are like real cheddar cheese, in appearance and/or texture.

Case 7:25-cv-02326-CS    Document 1-1    Filed 03/20/25    Page 13 of 29

48.   That palm oil is increasingly used to increase yield of foods with smaller amounts of real cheddar cheese, at lower costs, is confirmed by academic treatises and journals.[11]

49.   In fact, palm oil producers promote how "Cheese analogue[s] [are] cost effective compared to natural cheese due to the raw materials used," *viz.*, palm oil, resulting in "a simpler and cheaper manufacturing processes."[12]

50.   They even brag that palm oil can provide "comparable organoleptic attributes with natural cheese," presumably with consumers unable to discern the difference.

51.   Palm oil is not an ingredient used in any "real cheddar cheese," but used extensively in imitation cheese products.

52.   By using a predominant amount of whey and maltodextrin, as part of the non-macaroni component, the amount of real cheddar cheese used is decreased significantly.

53.   The Product is "misbranded" and misleads consumers, because the labeling and packaging causes consumers to expect real cheddar cheese is the

---

[11] Reham Habliza et al., "Production of Ras Cheese Analogue by Partially or Totally Substitution of Milk Fat with Palm Oil," Alexandria Science Exchange Journal 43.2 (2022): 343-352.

[12] Malaysian Palm Oil Council (MPOC), Healthy and Functional Palm-Based Cheese Analogue.

Case 7:25-cv-02326-CS    Document 1-1    Filed 03/20/25    Page 14 of 29

exclusive, or predominant, non-macaroni ingredient and/or component, or at least present in a significant, absolute and/or relative amount, compared to non-cheese ingredients, if any, even though this is false. AGM § 201(1); 21 U.S.C. § 343(a)(1).

54. Consumers expect that where a food, or a food's component, is represented as being "Made With," and/or "With," a valuable ingredient, like "real cheddar cheese," that ingredient will be the exclusive or predominant component of whatever it is a part of, or at least present in a significant, and non-de minimis amount.

55. The Product is "misbranded" and misleads consumers, because it contains "false or misleading representation[s] with respect to another food," because it is promoted as "Made With Real Cheddar Cheese," even though the main, non-macaroni components are not "real cheddar cheese." AGM § 201(1); 21 U.S.C. § 343(a)(1); 21 C.F.R. § 101.18(b); 1 N.Y.C.R.R. § 259.1(a)

56. The Product is "misbranded" and misleads consumers, because its name, "Macaroni & Cheese," promoted as "Made With Real Cheddar Cheese," "includes or suggests the name[s] of [real cheddar cheese]…but not all such ingredients [whey, maltodextrin, and/or palm oil], even though the names of all such ingredients are stated elsewhere in the labeling," on the fine print, back of the package, in the ingredient list. AGM § 201(1); 21 U.S.C. § 343(a)(1); 21 C.F.R. § 101.18(b); 1 N.Y.C.R.R. § 259.1(a)

12

57.  The Product is "misbranded" and misleads consumers, because the labeling and packaging, "Made With Real Cheddar Cheese," "fails to reveal facts material in light of such representations," because in place of an absolute and relatively greater amount of real cheddar cheese, it has substituted whey, maltodextrin, and/or palm oil, replacements for real cheddar cheese. AGM § 201(1); 21 U.S.C. § 343(a)(1); 15 U.S.C. § 55(a)(1).

58.  Substituting whey, maltodextrin, and/or palm oil, for real cheddar cheese, is of material interest to consumers, because (1) real cheddar cheese costs more than whey, maltodextrin, and/or palm oil, (2) real cheddar cheese contains more nutrients than whey, maltodextrin, and/or palm oil, including the most valuable component, milkfat, and more protein, (3) real cheddar cheese is an ingredient purchasers know and are familiar with, such that they are likely to buy and/or consume it in a variety of contexts, as opposed to whey, maltodextrin, and/or palm oil, and/or (4) real cheddar cheese has a creamy, sharp, and/or savory taste, due in part to milkfat and lactones, absent from whey, maltodextrin, and/or palm oil, added specifically because of their relatively bland taste.

59.  As a result of the false and misleading representations and omissions, the Product is sold at a premium price, approximately $3.45 for four 2.05 ounce (58 grams) bowls, higher than similar products, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and

13

omissions, when these factors are taken together, and/or utilized for the purpose of conjoint analysis, choice analysis, choice-based ranking, hedonic pricing, and/or other similar methods, to evaluate a product's attributes and/or features.

## JURISDICTION

60. Plaintiff Gay is a resident of Westchester County, New York.

61. The Court has jurisdiction over Defendant because it transacts business within New York, and sells the Product to consumers within New York, through one hundred and eleven Walmart stores, and/or online, to citizens of this State.

62. Defendant transacts business in New York, through the sale of the Product to citizens of New York, from one hundred and eleven Walmart stores, and/or online, to citizens of this State.

63. Defendant has committed tortious acts within this State through the distribution and sale of the Product, which is misleading to consumers in this State.

64. Defendant has committed tortious acts outside this State by distributing, marketing, labeling, packaging, representing, and/or selling the Product in a manner which causes injury to consumers within this State, by misleading them as to its contents, production practices, type, origins, quantity, amount, and/or quality, by regularly doing or soliciting business, or engaging in other persistent courses of conduct to sell the Product to consumers in this State, and/or derives substantial revenue from the sale of the Product in this State.

Case 7:25-cv-02326-CS    Document 1-1    Filed 03/20/25    Page 17 of 29

65.   Defendant has committed tortious acts outside this State by labeling the Product in a manner which causes injury to consumers within this State by misleading them as to its contents, ingredients, production practices, type, origins, amount, and/or quality, through causing the Product to be distributed throughout this State, such that it expects or should reasonably expect such acts to have consequences in this State and derives substantial revenue from interstate or international commerce.

## VENUE

66.   Venue is in this Court because Plaintiff Gay's residence is in Westchester County.

## PARTIES

67.   Plaintiff Gay is a consumer, not a merchant or re-seller.

68.   Plaintiff Gay is a resident of Westchester County, New York.

69.   Defendant Walmart Inc. is a Delaware corporation with a principal place of business in Arkansas.

70.   Defendant operates approximately one hundred and eleven Walmart stores in New York.

71.   While Walmart sells leading national brands of products, it also sells many products under one of its private label brands, Great Value.

72.   Private label products are made by third-party manufacturers, and sold

15

under the name of the retailer, or its sub-brands.

73. Previously referred to as "generic" or "store brand," private label products have increased in quality, and often are superior to their national brand counterparts.

74. Products under the Great Value brand have an industry-wide reputation for quality.

75. In releasing products under the Great Value brand, Defendant's foremost criteria was to have high-quality products that were equal to or better than the national brands.

76. Walmart gets national brands to produce its private label items due its loyal customer base and high standards.

77. Private label products under the Great Value brand benefit by their association with consumers' appreciation for the Walmart brand overall.

78. That Great Value-branded products satisfy or would satisfy this high bar was or would be proven by focus groups, which rated or would rate them equal to or above their name brand equivalent.

79. A survey by The Nielsen Co. "found nearly three out of four American consumers believe store brands [like Great Value] are good alternatives to national brands, and more than 60 percent consider them to be just as good."

80. Upon information and belief, private label products generate higher

16

Case 7:25-cv-02326-CS    Document 1-1    Filed 03/20/25    Page 19 of 29

profits for retailers like Walmart, because national brands spend significantly more on marketing, contributing to their higher prices.

81.   The result is that private label products can be sold at relatively lower costs, compared to national brands.

82.   The development of private label items is a growth area for Walmart, as they select only top suppliers to develop and produce Great Value products.

83.   Plaintiff is like most consumers, and looks to, and/or cannot avoid viewing, the front label of foods, to see what she is buying, and/or to learn basic information about them.

84.   Plaintiff is like most consumers, and is accustomed to the front label of packaging telling her about a food's predominant or significant ingredients, in terms of quality and/or value.

85.   Plaintiff expected real cheddar cheese was the Product's exclusive, or predominant, non-macaroni ingredient and/or component, or at least present in a significant, absolute and/or relative amount, compared to any non-cheese ingredients, if any.

86.   Plaintiff did not expect real cheddar cheese was not the Product's exclusive, or predominant, non-macaroni ingredient and/or component, or at least present in a significant, absolute and/or relative amount, compared to any non-cheese ingredients, if any.

87.    Plaintiff is like most consumers, who seeks foods and/or snacks which are a "healthy indulgence," based on natural, "real ingredients," compared to highly processed ones, and/or believed the presence of "real cheddar cheese" caused the Product to meet this criteria.

88.    Plaintiff read, saw, and/or relied on the packaging and labeling, to mean real cheddar cheese was the Product's exclusive, or predominant, non-macaroni ingredient and/or component, or at least present in a significant, absolute and/or relative amount, compared to any non-cheese ingredients, if any.

89.    Plaintiff bought the Product with the labeling and packaging identified here, at or around the above-referenced price.

90.    Plaintiff purchased the Product between October 2021 and October 2024, at Walmart locations in New York.

91.    Plaintiff expected real cheddar cheese was the Product's exclusive, or predominant, non-macaroni ingredient and/or component, or at least present in a significant, absolute and/or relative amount, compared to non-cheese ingredients, if any.

92.    Plaintiff paid more for the Product than she would have, had she known real cheddar cheese was not the Product's exclusive, or predominant, non-macaroni ingredient or component, nor present in a relatively significant amount, compared to non-cheese ingredients, as she would have paid less.

18

Case 7:25-cv-02326-CS    Document 1-1    Filed 03/20/25    Page 21 of 29

93. The Product was worth less than what Plaintiff paid, and she would not have paid as much absent Defendant's false and misleading statements and/or omissions.

94. The Product's features and/or attributes, when taken together, and/or utilized for the purpose of conjoint analysis, choice analysis, choice-based ranking, hedonic pricing, or other similar methods, impacted Plaintiff's purchasing choice, compared to similar products lacking its features and/or attributes.

## CLASS ALLEGATIONS

95. Plaintiff is a consumer, not a re-seller or merchant, and seeks to represent other consumers, in the class identified below, against a big business:

> All persons in New York who purchased the Product in New York during the statutes of limitations for each cause of action alleged.

96. Plaintiff's claims are based upon New York General Business Law ("GBL") §§ 349 and 350, passed by the legislature to protect unsophisticated consumers, against large and sophisticated commercial entities.

97. Excluded from the Class are (a) Defendant, Defendant's board members, executive-level officers, members, and attorneys, and immediate family members of any of the foregoing persons, (b) governmental entities, (c) the Court, the Court's immediate family, and Court staff and (d) any person that timely and properly excludes himself or herself from the Class.

19

Case 7:25-cv-02326-CS    Document 1-1    Filed 03/20/25    Page 22 of 29

98.  Common questions of issues, law, and fact predominate, and include whether Defendant's representations were, and are misleading, and if Plaintiff and class members are entitled to damages.

99.  Plaintiff's claims and basis for relief are typical to other members, because all were subjected to the same unfair, misleading, and/or deceptive representations, omissions, and actions.

100. Plaintiff is an adequate representative, because her interests do not conflict with other members.

101. No individual inquiry is necessary, since the focus is only on Defendant's practices and the class is definable and ascertainable.

102. Individual actions would risk inconsistent results, be repetitive, and/or are impractical to justify, as the claims are modest, relative to the scope of the harm.

103. The class is sufficiently numerous, with over one hundred members, because the Product has or had been sold throughout the State for several years, with the representations, omissions, packaging, and/or labeling identified here, from one hundred and eleven Walmart stores, and/or online, to citizens of this State.

104. Plaintiff's Counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

## CAUSES OF ACTION

### COUNT I
General Business Law ("GBL") §§ 349 and 350

20

105. To the extent required, this section incorporates by reference other paragraphs as necessary.

106. The purpose of the GBL is to protect consumers against unfair and deceptive practices.

107. This includes making state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection.

108. The GBL considers false advertising, unfair acts, and deceptive practices in the conduct of any trade or commerce to be unlawful.

109. Violations of the GBL can be based on (1) other laws and standards related to consumer deception, (2) public policy, established through statutes, laws, or regulations, (3) principles of the Federal Trade Commission Act ("FTC Act"), (4) FTC decisions with respect to those principles, (5) any rules promulgated pursuant to the FTC Act, and/or (6) standards of unfairness and deception set forth and interpreted by the FTC or the federal courts relating to the FTC Act . 15 U.S.C. §§ 41, 45, *et seq.*

110. Defendant's false and deceptive representations and omissions with respect to the Product's contents, origins, nutrient values, servings, ingredients, flavoring, type, functionality, and/or quality, are material in that they are likely to influence consumer purchasing decisions.

111. The replacement of real cheddar cheese with whey, maltodextrin, and/or

Case 7:25-cv-02326-CS     Document 1-1     Filed 03/20/25     Page 24 of 29

palm oil, for real cheddar cheese, is of material interest to consumers, because (1) real cheddar cheese costs more than whey, maltodextrin, and/or palm oil, (2) real cheddar cheese contains more nutrients than whey, maltodextrin, and/or palm oil, including the most valuable component, milkfat, and more protein, (3) real cheddar cheese is an ingredient purchasers know and are familiar with, such that they are likely to buy and/or consume it in a variety of contexts, as opposed to whey, maltodextrin, and/or palm oil, and/or (4) real cheddar cheese has a creamy, sharp, and/or savory taste, due in part to milkfat and lactones, absent from whey, maltodextrin, and/or palm oil, added because of their relatively bland taste.

112. The labeling of the Product violated the FTC Act, thereby violating the GBL, because the representations, omissions, packaging, and/or labeling, caused consumers to expect real cheddar cheese was the Product's exclusive, or predominant, non-macaroni ingredient and/or component, or at least present in a significant, absolute and/or relative amount, compared to any non-cheese ingredients, if any, which was unfair and deceptive to consumers.

113. The labeling of the Product violated the GBL, because the representations, omissions, labeling, and/or packaging, caused consumers to expect real cheddar cheese was the Product's exclusive, or predominant, non-macaroni ingredient and/or component, or at least present in a significant, absolute and/or relative amount, compared to non-cheese ingredients, if any, which was unfair and

Case 7:25-cv-02326-CS    Document 1-1    Filed 03/20/25    Page 25 of 29

deceptive to consumers.

114. The labeling of the Product violates laws, statutes, rules, regulations, and/or norms, which prohibit unfair, deceptive, and/or unconscionable conduct, against the public.

115. The labeling of the Product violated the GBL, because the representations, omissions, packaging, and/or labeling, was contrary to statutes and/or regulations, which prohibit consumer deception by companies in the labeling of food products.

| State | Federal |
|---|---|
| AGM § 200(7) | 21 U.S.C. § 342(b)(1) |
| AGM § 200(8) | 21 U.S.C. § 342(b)(2) |
| AGM § 200(10) | 21 U.S.C. § 342(b)(4) |
| AGM § 201(1) | 21 U.S.C. § 343(a)(1) |
| 1 N.Y.C.R.R. § 259.1(a) | 21 C.F.R. § 101.18 |

116. Plaintiff believed real cheddar cheese was the Product's exclusive, or predominant, non-macaroni ingredient and/or component, or at least present in a significant, absolute and/or relative amount, compared to non-cheese ingredients, if any.

117. Plaintiff paid more for the Product, and would not have paid as much, if she knew that real cheddar cheese was not the Product's exclusive, or predominant,

non-macaroni ingredient and/or component, or at least present in a significant, absolute and/or relative amount, compared to non-cheese ingredients, if any.

118. Plaintiff seeks to recover for economic injury and/or loss she sustained, based on the misleading labeling and packaging of the Product, a deceptive practice under the GBL.

119. Plaintiff may produce evidence showing how she and consumers paid more than they would have paid for the Product, relying on Defendant's representations, omissions, packaging, and/or labeling, using statistical and economic analyses, hedonic regression, hedonic pricing, conjoint analysis, and/or other advanced methodologies.

120. This means individual damages will be based on the value attributed to the challenged claims and/or omissions, a percentage of the total price paid.

121. As a result of Defendant's misrepresentations and omissions, Plaintiff was injured and suffered damages by payment of a price premium for the Product, which is the difference between what she paid based on its labeling, packaging, representations, statements, omissions, and/or marketing, and how much it would have been sold for without the misleading labeling, packaging, representations, statements, omissions, and/or marketing, identified here.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

24

Case 7:25-cv-02326-CS    Document 1-1    Filed 03/20/25    Page 27 of 29

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as Counsel for the class;

2. Awarding monetary damages and interest;

3. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

4. Other and further relief as the Court deems just and proper.

Dated:   November 11, 2024

Respectfully submitted,

/s/  Spencer Sheehan
Sheehan & Associates P.C.
60 Cuttermill Rd Ste 412
Great Neck NY 11021
Tel  (516) 268-7080
Fax (516) 234-7800
spencer@spencersheehan.com

Notice of Lead Counsel Designation

Lead Counsel for Plaintiff

Spencer Sheehan

Sheehan & Associates P.C.

Counsel for Plaintiff

25

## Certificate of Service

I certify that on November 11, 2024, I served and/or transmitted the foregoing by

the method below to the persons or entities indicated, at their last known address

of record (blank where not applicable).

|  | Electronic Filing | First-Class Mail | Email | Fax |
|---|---|---|---|---|
| Defendant's Counsel | ☐ | ☐ | ☐ | ☐ |
| Plaintiff's Counsel | ☒ | ☐ | ☐ | ☐ |
| Court | ☒ | ☐ | ☐ | ☐ |

/s/ Spencer Sheehan

ATTORNEY(S) : Sheehan & Associates, P.C.
INDEX # : 74988/2024
PURCHASED/FILED : November 11, 2024
STATE OF : NEW YORK
COURT : Supreme
COUNTY/DISTRICT : Westchester

## AFFIRMATION OF SERVICE - SECRETARY OF STATE

Dolores Gay, individually and on behalf of all others similarly situated

Plaintiff(s)

against

Walmart Inc.

Defendant(s)

STATE OF NEW YORK )
COUNTY OF ALBANY )SS
CITY OF ALBANY )

**DESCRIPTION OF PERSON SERVED:**     Approx. Age: __60 yrs__

Weight: __120 lbs__  Height: __5' 1"__  Gender: __Female__  Race: __White__

Hair color: __Brown__  Other: _____

__Robert Guyette_____, being duly sworn, deposes and says: deponent is over
the age of eighteen (18) years; is not a party to this action, and resides in the State of NY, and that on
__February 18, 2025_____, at __2:20 PM__, at the office of the Secretary of State of the State of NY,
located at 99 Washington Ave, 6th Fl, Albany, New York 12231 deponent served:
**SUMMONS, COMPLAINT AND NOTICE OF ELECTRONIC FILING**

on

**Walmart Inc.**

the Defendant in this action, by delivering to and leaving with     **Nancy Dougherty**

AUTHORIZED AGENT in the Office of the Secretary of State, of the State of New York, personally at the

Office of the Secretary of State of the State of New York, two (2) true copies   thereof and that at the time of

making such service, deponent paid said Secretary of State a fee of     $40     dollars; That said service

was made pursuant to Section   **BUSINESS CORPORATION LAW §306**.

Deponent further says that deponent knew the person so served as aforesaid to be the agent in the Office

of the Secretary of State of the State of New York, duly authorized to accept such service on behalf of said

defendant.

I affirm on __FEBRUARY 19, 2025_____, under penalties of perjury under the laws of New York, which may
include a fine or imprisonment, that the foregoing is true, and I understand that this document maybe filed in an
action or proceeding in a court of law.

X_____
   ROBERT GUYETTE

Invoice·Work Order # 2507141
Attorney File # **Dolores Gay**

1 of 1